IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
) 3:13-CR-12
v. )
) (JORDAN / GUYTON)
JOSEPH MANNING, )
)
Defendant. )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.§ 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Joseph Manning's Motion to Suppress Statement [Doc. 70] and Motion to Suppress Evidence [Doc. 72], both filed on May 3, 2013. The parties appeared for a hearing on the motion on May 30, 2013. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the Government. Attorney Mark E. Brown represented the Defendant, who was also present. At the conclusion of the hearing, the Court permitted the parties to file supplemental briefs, if they chose to do so. The Defendant filed a supplemental brief [Doc. 102] on June 14, 2013. The transcript [Doc. 111] of the evidentiary hearing was filed on June 26, 2013. At that time, the Court took the motions under advisement.

## I. POSITIONS OF THE PARTIES

Defendant Manning is charged [Doc. 3] with conspiring to distribute and possess with intent to distribute marijuana from March 27, 2012, to February 5, 2013. First, the Defendant asks the

1

Court to suppress evidence gained in the search of three packages on November 23, 2012; December 6, 2012; and January 9, 2013, pursuant to search warrants. The Defendant argues that probable cause did not exist to issue the search warrants and that two of the search warrants contain errors rendering them facially defective. The Defendant also challenges the execution of the December 6 search warrant, arguing that the officer exceeded the scope of the search warrant in seizing marijuana from the package. Second, the Defendant asks the Court to suppress his statement given at the time of his arrest on February 11, 2013, because it was made in violation of his Fifth Amendment right not to incriminate himself and his Sixth Amendment right to counsel.

The Government responds that the search warrants were supported by probable cause and are not facially defective. It contends that any errors in the applications for the search warrants do not render the warrants defective or cause the Defendant any prejudice. It maintains that Inspector Boles properly seized marijuana from a package on December 6, 2012, pursuant to the plain view doctrine. Finally, it argues that the executing officers acted in good faith reliance on the search warrants and that the exclusionary rule should not be applied in this case. The Government also argues that the totality of the circumstances reveal that the Defendant voluntarily gave a statement on February 11, 2013, during the course of a lawful arrest.

## II. SUMMARY OF THE TESTIMONY

At the May 30 hearing, the Government called two witnesses, Knoxville Police Department (KPD) Investigator Jeremy Maupin and Postal Inspector Wendy Boles.

Investigator Maupin testified that he works on the KPD's Organized Crime Unit and is a task force officer for the Drug Enforcement Administration (DEA). Investigator Maupin stated that in

2

the summer of 2012, Postal Inspector Wendy Boles notified him that she was investigating a group that was mailing controlled substances from San Francisco, California, and Seattle, Washington, to Knoxville, Tennessee. He joined in this investigation, which resulted in an Indictment naming the Defendant Joseph Manning. On February 11, 2013, Investigator Maupin arrested the Defendant at the United States Probation Office in Tacoma, Washington. The Defendant had reported to the Probation Office to submit to drug testing. Immediately after the Defendant completed the drug test, Investigator Maupin led him to another room, handcuffed him, and placed him under arrest.

Investigator Maupin testified that after he handcuffed the Defendant, he identified himself, explained the nature of the charges to the Defendant, and advised him of the <u>Miranda</u> rights. The Defendant said he understood those rights. Investigator Maupin told the Defendant "if he wanted to cooperate, I would allow him to do so. We could sit down and talk about it." [Tr. 7][1] United States marshals then arrived to process the Defendant for his initial appearance. Investigator Maupin accompanied the marshals and continued to answer the Defendant's questions while he was fingerprinted and photographed. Investigator Maupin stated that the Defendant then told him that "he wanted to 'talk[.]'" [Tr. 8]

Investigator Maupin stated that the Defendant was taken to an interview room, where he sat across from Investigator Maupin and Inspector Boles and was separated from them by a screened window. Investigator Maupin again advised the Defendant of his rights by reading from a DEA form. A blank Advice of Rights form identical to the one Investigator Maupin used was submitted as an exhibit [Exh. 1]. Investigator Maupin said that he usually asked the individual to initial after each sentence on the form and to sign it, but he did not do that in this case, because a metal screen

---

[1] The transcript [Doc. 111] of the May 30 hearing was filed on June 26, 2013.

separated him from the Defendant. Investigator Maupin stated that the Defendant agreed he understood his rights and began to give a statement. Investigator Maupin interviewed the Defendant for fifteen to twenty minutes. At that point, an attorney, who was to be appointed to represent the Defendant at his initial appearance, came into the interview room. Investigator Maupin told the attorney to contact him, if the Defendant wanted to continue cooperating. Then, Investigator Maupin and Inspector Boles left. Investigator Maupin said that the Defendant did not request an attorney at any time during the interview.

On cross-examination, Investigator Maupin testified that he first encountered the Defendant when the Defendant emerged from the bathroom after giving a urine sample. When Investigator Maupin arrested the Defendant, he did not have an advice of rights form on his person, but Inspector Boles had one in another room, where she was with the Defendant's brother. Investigator Maupin agreed that he could have gone to Inspector Boles and retrieved the form. He said that he normally advises an individual whom he has arrested of his rights orally and asks the individual to sign a rights waiver only if the person agrees to be interviewed. Investigator Maupin stated that it is his practice to ask the individual to sign the rights waiver after the person sits down to give a statement. Investigator Maupin said that in this case, he did not have the Defendant sign the rights waiver when he interviewed him because of the screen. Investigator Maupin agreed that he could have asked the marshal to take the form to the Defendant.

Investigator Maupin testified that within minutes of the Defendant's arrest, marshals arrived to take him to the United States Marshal's Office, which was on the other side of the building from the Probation Office. Investigator Maupin stated that as part of the advice of rights, he advised the Defendant that if he wanted an attorney, Maupin could not continue the interview.

4

Postal Inspector Wendy Boles testified that she has served as a postal inspector, investigating crimes involving the United States mail, for ten years. She stated that in May of 2012, a postal worker contacted her about what he or she believed were suspicious packages coming from San Francisco, California, to various addresses in the delivery area of the Knoxville North Station Post Office. Although the return addresses varied on these packages, the packages bore similar handwriting. Also, the names of the recipients listed on the packages were not known by the mail carriers to be persons receiving mail at the listed addresses. She stated that in the course of this investigation, law enforcement obtained three search warrants for parcels.

Inspector Boles stated that the first search warrant, number MJ 12-5206, was obtained on November 23, 2012. Postal Inspector Brett Willyerd, who was assisting in the investigation in Seattle, Washington, provided an affidavit in support of the search warrant. Inspector Boles said that the information in the affidavit regarding an investigation in Knoxville, Tennessee, came from her. The search warrant authorized the search of a parcel. Execution of the search warrant revealed that the package contained a Lite-Brite toy, inside of which was concealed $7,810. In order not to compromise the investigation, Inspector Willyerd left the currency inside the Lite-Brite, repackaged the parcel, and had the package delivered to the Defendant.

Inspector Boles testified that she provided the affidavit in support of the second search warrant, number 3:12-MJ-1150, which was issued at 5:15 p.m., on December 6, 2012. She stated that although the application for the search warrant bears a typed date of November 30, 2012, this was not the day that she sought the search warrant. She said that she sought the search warrant on December 6, 2012, and that the November 30, 2012, date was a typographical error. She stated that another postal inspector in her office had applied for a search warrant on November 30, 2012. She

5

believed his application was used as a template when the instant application was prepared, but the date was not changed.

Also, with regard to the December 6 search warrant, Inspector Boles stated that in the affidavit supporting the search warrant, she provided information that the Express Mail package, which she wanted to search, could contain controlled substances and currency. Inspector Boles stated that she wanted to search the package for both drugs and currency, because her past experience with parcels involved in narcotics trafficking caused her to believe that the package could contain both. She said that before she applied for the search warrant, a trained drug dog alerted on the package. The search warrant for the package authorized her to seize United States currency, documents, notes, invoices, orders, and records of payments relating to drug trafficking. She stated that she intended to ask to seize controlled substances as well and that the omission of controlled substances from this list of items to be seized was a "typographical error." [Tr. 30] Inspector Boles searched the package immediately after obtaining the search warrant, and it contained 9.8 pounds of marijuana. Inspector Boles stated that she immediately recognized the illegal nature of the contents of the package.

Inspector Boles testified that she also sought a search warrant for a package on January 9, 2013. This search warrant, number 3:13-MJ-1002, was issued at 3:08 p.m., on January 9, 2013, but the line for the length of time within which the search warrant must be executed was left blank. Inspector Boles stated that in her experience, the magistrate judge typically filled in that blank. She stated that she executed the January 9 search warrant later that same day and seized $18,000.

Inspector Boles stated that she was present when the Defendant was arrested. She stated that she and Investigator Maupin first arrested the Defendant's brother Julian Manning. She then sat with

6

Julian Manning in a separate room, while Investigator Maupin waited on the Defendant to arrive. Inspector Boles said she first saw the Defendant in the interview room at the marshal's office, after he had been arrested. She was present when Investigator Maupin read the Defendant his rights and heard the Defendant acknowledge those rights. The Defendant could not sign a rights waiver form due to the large screen in the room. She stated that although Investigator Maupin held the form up to the screen, she did not think the Defendant could see it because it was hard to see through the screen. Nevertheless, she stated that she had no doubt that the Defendant heard the advice of rights given by Investigator Maupin.

On cross-examination, Inspector Boles stated that during her investigation of packages mailed from California and Washington to Knoxville, she contacted the postal inspector in San Francisco. She stated that the packages from San Francisco to Knoxville were mailed from the same post office, so the postal inspector there conducted video surveillance of the mailings. Although the investigation began in May 2012, she did not seek a search warrant for a package until December 2012. Inspector Boles stated that the United States Attorney's Office prepares the typewritten portions of the search warrant for the agents, but the information on the warrant comes from the agent. It is the agent's responsibility to type the affidavit supporting the search warrant and to review the information in the search warrant for accuracy.

Inspector Boles testified that Inspector Willyerd obtained the November 23, 2012 search warrant (number MJ 12-5206). She stated that she had referred the package in question to Inspector Willyerd.

With regard to the December 6 search warrant (3:12-MJ-1150), Inspector Boles agreed that the application for the search warrant is dated November 30, 2012, and asks to seize controlled

7

substances. She acknowledged that the search warrant is dated December 6, 2012, and does not mention controlled substances as an item to be seized. She stated that the supporting affidavit provides the following reasons why a particular Express Mail parcel would stand out from other business packages: (1) The package lacks advertizing on the mailing container, (2) it is mailed from one individual to another, (3) it is mailed from a post office in a different zip code from the zip code on the return address, (4) its seams are heavily taped in order to conceal scent, and (5) the recipient's signature is waived. Inspector Boles testified that the package that she sought to search in the December 6 search warrant was not a business mailing but rather was sent from one individual to another. She agreed that it would not be unusual for an individual out running errands to mail a parcel at a post office in a different zip code from that in which the person lived. She also agreed that it was not uncommon for someone to apply a lot of tape to a box to be mailed. Inspector Boles was also familiar with instances in which an individual mailing an Express Mail package to another individual waived the signature of the recipient.

Inspector Boles stated that before seeing the December 6 search warrant, she observed a drug dog give a positive alert on the package. She stated that she placed the suspect package in a hallway with other cardboard boxes that resembled packages but were not actual mail. She left space between the packages to permit the dog to maneuver around them. She acknowledged that a photograph of the drug dog sitting beside the suspect package did not include the other boxes. She stated that the other boxes were behind and further down the hallway from the dog's location in the photograph. Inspector Boles stated that she does not make a video recording when a drug dog inspects a package and that this was the first time she had photographed a drug dog in conjunction with a search warrant application.

8

Inspector Boles testified that the January 9 search warrant was for a package addressed to Dwayne Benson at 7830 Custer Road, Lakewood, Washington. She did not know whether the Defendant ever used Dwayne Benson as an alias or ever lived at that address. She stated that the affidavit supporting this search warrant identified two other suspicious Express Mail packages mailed from Washington to Knoxville and addressed to two separate addresses. Search warrants were not sought for these packages. She participated in surveillance of 1605 Tecumseh Drive when one of these packages was delivered. She observed Lamar Johnson arrive at this residence and take custody of the package, after it was delivered. She followed Johnson and observed him making "heat runs," which is evasive driving designed to detect whether law enforcement is following. She then lost sight of Johnson, who was later observed by another officer at a residence.

Inspector Boles stated that following the Defendant's arrest in the probation office in Tacoma, Washington, she was present in the room with Investigator Maupin and the Defendant, who was behind a barrier. The rights waiver form was shown to the Defendant but was not given to him to sign, because they had no way to give it to him. She agreed that they could have given the form to the marshal, who could have gone to the other side of the barrier and given it to the Defendant.

### III. FINDINGS OF FACT

Based upon the testimony at the evidentiary hearing, the Court makes the following factual findings:

In May 2012, law enforcement in Knoxville, Tennessee; San Francisco, California; and later Seattle, Washington began investigating Express Mail packages mailed between those locations. A search warrant was issued in Tacoma, Washington, on November 23, 2012, for a package

9

suspected in this investigation. A search of that package revealed a Lite-Brite toy, which contained $7,810. Postal Inspector Brett Willyerd repackaged the parcel and had it delivered. Search warrants were issued in Knoxville on December 6, 2012, and January 9, 2013. Postal Inspector Wendy Boles executed these search warrants. Inspector Boles found 9.8 pounds of marijuana in the package searched on December 6 and $18,000 in the package searched on January 9. As a result of this investigation, a grand jury returned an Indictment, charging the Defendant, on February 5, 2013.

On February 11, 2013, KPD Investigator Jeremy Maupin and Inspector Boles arrested the Defendant and his brother at the United States Probation Office in Tacoma, Washington. Investigator Maupin identified himself, handcuffed the Defendant, explained the charges, and advised the Defendant of his Miranda rights. The Defendant was taken to the United States Marshal's Office in another part of the building for processing. While there, the Defendant asked Investigator Maupin questions about the charges and then told Investigator Maupin that he wanted to talk. Marshals placed the Defendant in an interview room with Investigator Maupin and Inspector Boles. The Defendant was separated from the officers by a metal screen that divided the interview room. Investigator Maupin again advised the Defendant of the Miranda warnings, including his right to speak with an attorney before questioning. Investigator Maupin read the advice of rights from a rights waiver form. He did not have the Defendant sign the form. The officers interviewed the Defendant for fifteen to twenty minutes. The interview ended when an attorney, who had been contacted by the court to represent the Defendant at his initial appearance in the Western District of Washington, arrived at the interview room to meet with the Defendant. Investigator Maupin gave the attorney his contact information in the event that the Defendant wanted to give another statement.

# IV. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In the instant case, the Defendant asks the Court to suppress evidence seized in the execution of search warrants for three Express Mail packages. He argues that probable cause did not exist to issue the search warrants and that errors on the face of the search warrants and warrant applications rendered them defective. The Defendant also asks the Court to suppress the statement he gave following his arrest on February 11, 2013. The Defendant contends that this statement was made in violation of his Fifth Amendment protection against self-incrimination and his Sixth Amendment right to counsel. The Court examines each of these contentions in turn.

## A. Search of Express Mail Packages

The Defendant challenges the issuance of three search warrants for packages. A search warrant may issue upon the judge finding probable cause to believe that the location to be searched contains contraband or the evidence of a crime. United States v. Besase, 521 F.2d 1306, 1307 (6th Cir. 1975). Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

probable cause is a flexible, common-sense standard. It merely

11

> requires that the facts available to the officer would "warrant a man
> of reasonable caution in the belief," Carroll v. United States, 267 U.S.
> 132, 162, . . . (1925), that certain items may be contraband or stolen
> property or useful as evidence of a crime; it does not demand any
> showing that such a belief be correct or more likely true than false.
> A "practical, nontechnical" probability that incriminating evidence is
> involved is all that is required.  Brinegar v. United States, 338 U.S.
> 160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983).  In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).  Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236).  This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches.  Id.  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.  The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39.  In making this determination, the Court considers only the information that was before the issuing judge–in other words, only what is contained within the four corners of the supporting affidavit. United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973).

The Defendant argues that probable cause did not exist to issue any of the three warrants. He also argues that the December 6 and January 9 search warrants are facially defective and that the

12

December 6 search warrant was improperly executed.

*(1) November 23, 2012 Search Warrant, MJ 12-5206*

The Defendant contends that the affidavit of Inspector Willyerd supporting the November 23 search warrant does not provide probable cause to believe that the Express Mail package addressed to Joseph Williams in Spanaway, Washington, would contain evidence of drug trafficking. He argues that Inspector Willyerd's affidavit reveals only that the package bears a handwritten address for a person not known to receive mail there, an incorrect house number, and was the subject of a drug detection dog alert, although it contained no narcotics. He contends that this scant and primarily innocent information fails to provide probable cause.

The Court finds that Inspector Willyerd's affidavit contains the following information relevant to the probable cause analysis:

> (1) Based upon his training and experience, Agent Willyerd knows drug dealers prefer to use Express Mail because it is reliable. [Doc. 91, Exh. 1, ¶4] Express Mail packages transporting controlled substances and the proceeds from controlled substances frequently have the following characteristics making them distinct from typical business packages: (a) handwritten labels; (b) the label does not indicate that the person paid by credit card or business account, which would be traceable; (c) no advertizing on the box and mailed from one individual to another; (d) the addresses are often fictitious or to persons not known to receive mail at the stated address; (e) the zip code of the sender is different from the zip code of the post office at which the package was mailed, (f) the seams are heavily taped in order to conceal scent; (g) the sender has waived a confirmation signature by the recipient. [Doc. 91, Exh. 1, ¶6] Packages meeting some of these criteria are often further scrutinized. [Doc. 91, Exh. 1, ¶7]

> (2) Inspector Wendy Boles notified the affiant about the suspect Express Mail package with a handwritten label, being mailed from

13

Knoxville to Spanaway, Washington.  [Doc. 91, Exh. 1, ¶10]

(3)  The return address on the suspect package is incomplete, omitting the word "South," and the sender "Jessica Smith" is not known to receive mail at this address.  [Doc. 91, Exh. 1, ¶10]

(4)  A trained narcotics detection dog alerted on the suspect package, which was hidden in a cabinet in an office.  [Doc. 91, Exh. 1, ¶11]  An exhibit [Doc. 91, Exh. 1, pp.18-20] attached to Inspector Willyerd's affidavit and incorporated therein provides the training and certification of the drug detection dog Caro and his handler, Task Force Officer Cory Stairs.[2]

The Court finds that the totality of the circumstances provided in the affidavit gives probable cause to issue the November 23 search warrant.  Based upon Inspector Willyerd's training and experience, the suspect package has several characteristics consistent with a package containing controlled substances or drug proceeds:  It is an Express Mail package with a handwritten address, being mailed from one individual to another.  The return address is incomplete, and the sender is not known to receive mail there.  The Defendant argues that these are all innocent characteristics that are alone insufficient to provide probable cause.  However, the affidavit also states that a trained drug detection dog alerted on the package.  The affidavit of Task Force Officer Cory Stairs, the dog's handler, states that the drug dog in this case is certified to alert to the odor of narcotics, including when the odor of narcotics has been absorbed into currency.  "An alert by a properly trained and reliable drug-detection dog 'is sufficient to establish probable cause for the presence of a controlled substance.'" United States v. Stubblefield, 682 F.3d 502, 505 (6th Cir. 2012) (quoting United States v. Diaz, 25 F.3d 392, 394 (6th Cir.1994)).  Moreover, "[i]f a bona fide organization has certified a

---

[2]Officer Stairs' affidavit states that he and Caro were certified on November 14, 2012, by the Washington State Police Canine Association and continue to train regularly to maintain proficiency.  Officer Stairs' affidavit states that Caro has a ninety-two percent accuracy rate in the field.

14

dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Florida v. Harris, 133 S. Ct. 1050, 1057 (2013).

The Defendant argues that the drug dog alert does not provide probable cause because no narcotics were found in the package. The Court observes first that it can only consider the information that was before the issuing judge in assessing probable cause. Hatcher, 473 F.2d at 323. The fact that the package ultimately did not contain narcotics is not relevant to the instant analysis. Second, Inspector Willyerd's affidavit along with the attached affidavit by Officer Stairs establishes that the dog would alert to items, such as currency, that have absorbed the odor of narcotics. The Court finds that the suspicious characteristics of the package combined with the alert by the drug detection dog provide probable cause to search the package for drugs and currency.

*(2) December 6, 2012 Search Warrant, 3:12-MJ-1150*

The Defendant argues that the December 6 search warrant is both facially defective and unsupported by probable cause. He also argues that the December 6 search warrant was improperly executed because Inspector Boles seized marijuana from the package, but the search warrant does not authorize the seizure of controlled substances.

*(i) Facial Defect*

The Defendant contends that the search warrant is defective on its face, because it lacks the particularity required by the Fourth Amendment. The search warrant identifies the property to be seized from the package as "United States currency, documents, notes, invoices, orders, and records

of payments related to illegal drug trafficking." [Doc. 91, Exh. 2, p.1] In contrast, the Application for Search Warrant [Doc. 91, Exh. 2, p.2] also asks to seize controlled substances. In her supporting affidavit, Inspector Boles [Doc. 91, Exh. 2, ¶25] states that she believes probable cause exists to search for controlled substances as well as currency, documents, or other evidence relating to the mailing and distribution of controlled substances. The Defendant argues that based upon the alert by the drug detection dog, which was detailed in the affidavit, the search warrant should have authorized the seizure of controlled substances. He contends that the failure to include controlled substances in the list of items to be seized renders the search warrant insufficiently particular.

The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement forecloses the opportunity for a general search and "prevents the seizure of one thing under a warrant describing another" by restricting the discretion of the executing officer. Marron v. U.S., 275 U.S. 192, 196 (1927). "'A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" United States v. Savoy, 280 F. App'x 504, 510 (6th Cir.) (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)), cert. denied, 129 S. Ct. 742 (2008). "The particularity requirement eliminates the 'danger of unlimited discretion in the executing officer's determination of what is subject to seizure.'" Id. (quoting United States v. Savoca, 761 F.2d 292, 298-99 (6th Cir. 1985)). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." United States v. Henson, 848 F.2d 1374, 1383 (6th Cir. 1988). The description of items to be seized pursuant to a search warrant is sufficient "'if it is as specific as the circumstances and the nature of the activity under

16

investigation permit.'" Id. (quoting United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985)).

The December 6 search warrant provides a specific list of items that can be seized from the package. Thus, Inspector Boles was able to identify the things which she was authorized to seize from the package. The fact that the affidavit provides probable cause to search for additional items does not make the search warrant insufficiently particular.[3] The Court finds that the December 6 search warrant is not facially defective.

### (ii) Probable Cause

The Defendant argues that Inspector Boles' affidavit fails to provide probable cause to issue the December 6 search warrant because the presentation of the package to the drug dog was unduly suggestive. He also contends that the affidavit contains false information as to the date that the suspect package was mailed and received at the Knoxville post office.

Inspector Boles' affidavit states that a trained drug detection dog alerted on the suspect package. [Doc. 91, Exh. 2, ¶23] Inspector Boles describes the circumstances of the dog sniff as follows:

> As per protocol, I placed the subject parcel among other boxes of similar size and shape at the U.S. Postal Inspection Service, Knoxville Domicile. Officer Marrero[, the dog's handler,] informed your affiant that "Mako" gave a positive alert to the presence of drug odor from the subject parcel with a final passive response of sitting down at the subject parcel (captured by photograph and attached herewith as EXHIBIT A).

---

[3]The Court will address the Defendant's argument that the search warrant was improperly executed because it did not authorize Inspector Boles' seizure of marijuana in part (iii) below. The improper execution of a search warrant does not make the search warrant itself facially defective.

[Doc. 91, Exh. 2, ¶23] The Defendant argues that the attached photograph[4] depicts the dog sitting beside a single package with no other packages in the picture. He concludes that because a single package is depicted in the photograph, the circumstances surrounding the dog sniff are suspicious and the dog's alert on the package does not provide probable cause.[4] The Court disagrees. As stated above, the positive alert of a trained drug detection dog provides probable cause to search a container for controlled substances. See Stubblefield, 682 F.3d at 505. The affidavit states that the dog positively alerted on the suspect package. The attached photograph does not purport to show the full search, but merely the dog's alert on the suspect package. The Court finds that the photograph does not contradict or detract from the affidavit's assertion that the dog alerted on the suspect package.

The Defendant also argues that the dates regarding when the suspect package was mailed and received at the Knoxville post office are false and may not be considered in the probable cause analysis. He argues that if this information is not considered, the affidavit fails to provide probable cause. The affidavit states that the following events occurred on December 5-6, 2012:

(1) On December 5, 2012, the Defendant told a confidential source

[4]The Court notes that Exhibit A, the photograph of the drug detection dog sitting beside the package, was not included in the exhibit [Doc. 92, Exh. 2] provided to the Court.

[4]In his supplemental brief, the Defendant also argues that Inspector Boles testified that a second box was located behind the dog in the photograph. He argues that this testimony reveals that the drug dog only had two boxes to choose between and the circumstances of the dog sniff remain suspicious. First, the Court again observes that it may only look at the information contained in the affidavit and not to Inspector Boles testimony about the circumstances of the dog sniff. Hatcher, 473 F.2d at 323. Second, if the Court were able to consider Inspector Boles' testimony, it supports her statement in the affidavit that she placed multiple packages with the suspect package for the dog to sniff. At the May 30 hearing, Inspector Boles testified that she placed the suspect package and "other cardboard boxes that resembled packages" in the hallway for the dog to sniff. [Tr. 40] In response to defense counsel's inquiry about the photograph of the dog with a single package, Inspector Boles testified that the other packages were behind the dog. [Tr. 40]

18

that he would send a package containing marijuana to an address controlled by the confidential source and that the confidential source should expect the package the next day. [Doc. 91, Exh. 2, ¶19]

(2)  Inspector Boles reviewed a postal service database on December 5, 2012, and learned that two Express Mail packages were en route to Knoxville from Spanaway, Washington 98387.  [Doc. 91, Exh. 2, ¶19]  These packages were scheduled to be delivered on December 6, 2012.  [Doc. 91, Exh. 2, ¶20]

(3)  On December 6, 2012, Inspector Boles took custody of an Express Mail package, sent from Washington zipcode 98387 and bearing similar handwriting as other packages involved in this investigation.  [Doc. 91, Exh. 2, ¶21-22]

(4)  Also, on December 6, the drug detection dog alerted to this package.  [Doc. 91, Exh. 2, ¶23]

The Defendant contends that the December 5 and 6 dates are false because the Application for a Search Warrant [Doc. 91, Exh. 2, p.2] is dated November 30, 2012.  He argues that because Inspector Boles applied for the search warrant on November 30, the package could not have been mailed on December 5 and received in Knoxville on December 6.

In Franks v. Delaware, 438 U.S. 154, 155, 164 (1978), the Supreme Court examined whether a defendant ever has the right, pursuant to the Fourth and Fourteenth Amendments, to contest the truthfulness of sworn statements of fact in a search warrant affidavit.  Sworn affidavits in support of search warrants are, in the first instance, presumed to be valid.  Id. at 171.  Nevertheless, a defendant may attack the veracity of factual statements in the affidavit under certain limited circumstances:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a

19

hearing be held at the defendant's request.

Id. at 155-56; see also United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). If the defendant

makes this showing and is granted what has come to be known as a "Franks hearing," he or she must

show by a preponderance of the evidence that the affiant intentionally or recklessly included false

statements, which are necessary to the probable cause finding, in the affidavit. Franks, 438 U.S. at

156; Bennett, 905 F.2d at 934. If the defendant successfully makes this showing, the evidence

gained as a result of the search must be suppressed. Franks, 438 U.S. at 156; Bennett, 905 F.2d at

934.

The Court finds that the Defendant has failed to make a substantial preliminary showing that

Inspector Boles intentionally, knowingly, or recklessly included false dates in the affidavit. The

search warrant was issued at 5:15 p.m., on December 6, 2012, which supports the information in the

affidavit that the package was mailed on December 5 and received on December 6. Additionally,

although the Defendant was not entitled to a hearing to challenge Inspector Boles' statements in the

affidavit, she explained the discrepancy in the dates at the May 30 hearing. Inspector Boles testified

that the November 30, 2012 date on the application is a "typographical error." [Tr. 26] She stated

that a previous application was likely used as a template for the instant application and that the date

from the previous application was not changed. [Tr. 26] She said that she applied for the search

warrant on December 6, 2012, not November 30, 2012. [Tr. 26] Based upon this uncontradicted

testimony, the Court finds that the erroneous date is in the application, not in Inspector Boles'

affidavit or the search warrant. The application was not incorporated into the search warrant.

Accordingly, the Court agrees with the Government that the Defendant has not been prejudiced by

the typographical error in the application.

20

The Court finds that Inspector Boles' affidavit provides probable cause for the issuance of the December 6 search warrant. Inspector Boles states that certain characteristics of the suspect Express Mail package are distinct from legitimate business mailings: It had handwritten addresses, was mailed from one individual to another, bore a fictitious return address, and was mailed to a person not known to receive mail at the listed address. [Doc. 91, Exh. 2, ¶¶5, 21 & 22 ]

Inspector Boles details the history of the investigation into packages mailed between first San Franciso, California and later Spanaway, Washington and Knoxville, Tennessee. Postal employees noticed a high volume of Express Mail packages, bearing the same distinctive handwriting and mailed from the same post office in San Francisco to multiple addresses in Knoxville. [Doc. 91, Exh. 2, ¶9] The Defendant and his brother, who previously resided in Knoxville, both issued change of address forms on August 21 and September 4, 2012, listing their new residences in Spanaway, Washington. [Doc. 91, Exh. 2, ¶¶11, 12 &13] The Defendant was known by law enforcement from previous narcotics investigations. [Doc. 91, Exh. 2, ¶10] On September 4, 2012, Express Mail packages began arriving from Spanaway, Washington, for the addresses[5] previously receiving Express Mail packages from San Francisco. [Doc. 91, Exh. 2, ¶14] Surveillance of the Knoxville addresses on the Express Mail packages revealed Lamar Johnson frequenting these addresses . [Doc. 91, Exh. 2, ¶15]

---

[5]In his supplemental brief, the Defendant states that there was only one prior delivery to 1804 Iroquois Street, the address on the suspect package, during the course of the investigation. He states that there were not multiple prior deliveries to the Iroquois address, and thus, the affidavit does not provide probable cause. This information from the Defendant is not contained in the affidavit and, thus, cannot be considered by the Court in its four corners analysis. Additionally, the Court finds that this assertion by the Defendant does not contradict the information in the affidavit that there were multiple consistent deliveries to different addresses in the Knoxville North Station delivery area.

A confidential source informed law enforcement that the Defendant was involved in shipping marijuana to Knoxville. [Doc. 91, Exh. 2, ¶¶17 & 18] The controlled source, who previously made two controlled purchases of marijuana from coconspirators at the Defendant's direction, arranged on December 5, 2012, for the Defendant to ship marijuana to him on December 6, 2012. [Doc. 91, Exh. 2, ¶¶18 & 19] Inspector Boles intercepted one of two Express Mail packages from Spanaway to Knoxville with a scheduled delivery of December 6 and bearing similar handwriting to the other packages in the investigation. [Doc. 91, Exh. 2, ¶¶20-22] A trained drug detection dog alerted on the suspect package. [Doc. 91, Exh. 2, ¶23] On December 6, 2012, the confidential source advised that the Defendant had told him that the marijuana was not being sent directly to him but that something was already en route and that the confidential source could get some when it arrived. [Doc. 91, Exh. 2, ¶24] This information in the affidavit provides probable cause to believe that the suspect Express Mail package contains controlled substances, drug proceeds, or other evidence of drug trafficking.

### *(iii) Execution of Search Warrant*

Finally, the Defendant challenges the execution of the December 6 search warrant. He argues that Inspector Boles seized marijuana from the package when the search warrant did not authorize the seizure of controlled substances. As discussed above, the search warrant authorized Inspector Boles to search for "United States currency, documents, notes, invoices, orders, and records of payments related to illegal drug trafficking." [Doc. 91, Exh. 2, p.1] The Government argues that Inspector Boles properly seized the marijuana because it was in plain view once she opened the package pursuant to the search warrant.

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)); see also United States v. Bishop, 338 F.3d 623, 626 (6th Cir. 2003), cert. denied, 540 U.S. 1206 (2004); United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996). In the present case, Inspector Boles lawfully searched the package pursuant to the December 6 search warrant. Inspector Boles testified that that the illegal nature of the marijuana inside the package was immediately apparent. The Defendant's objections to the seizure of the marijuana all relate to his contention that the search warrant was not valid. The Court has concluded that the December 6 search warrant was valid and finds that Inspector Boles properly seized the marijuana inside the package pursuant to the plain view doctrine.

*(3) January 9, 2013 Search Warrant, 3:13-MJ-1002*

The Defendant argues that the January 9 search warrant is invalid because it is not supported by probable cause and because it fails to state the date by which it must be executed. The Court reviews each of these contentions.

*(i) Probable Cause*

The January 9 search warrant authorizes the search of an Express Mail package addressed to Dewayne Benson at 7830 Custer Road in Lakewood, Washington. The package bears the return address of Francois Pierre at 1733 Rosedale Street, Knoxville, Tennessee. Probable cause for the

search of the suspect package consists of certain characteristics of the package that make it distinct

from a legitimate business mailing;[6] the history of the investigation of Express Mail packages from

San Francisco, California, and Spanaway, Washington, to Knoxville, Tennessee;[7] the evidence

seized in the two prior searches of packages related to this investigation,[8] and the actions of

codefendant Lamar Johnson with regard to packages suspected in the investigation.[9]  The Defendant

---

[6]The individual on the return address does not receive mail at that address.  [Doc. 91, Exh. 3, ¶¶5, 24 ] The address is handwritten and the sender paid in cash to mail the package. [Doc. 91, Exh. 3, p.3 & ¶¶5, 24-25] The return address on the package is same address at which Lamar Johnson had received another Express Mail package associated with this investigation. [Doc. 91, Exh. 3, ¶24]

[7]The history of the investigation is summarized above with regard to the December 6 search warrant.  This information is also provided in Inspector Boles' affidavit supporting the January 9 search warrant. [Doc. 91, Exh. 3, ¶¶4-22] The January 9 affidavit also contains an attached list of 118 Express Mail packages believed to be associated with this investigation. [Doc. 91, Exh. 2, pp.15-20]

[8]The November 23, 2012 search of an Express Mail package addressed to Joseph Williams at 20815 18th Avenue in Spanaway, Washington, revealed $7810 hidden inside a Lite Brite toy.  [Doc. 91, Exh. 3, ¶¶19-20] The December 6, 2012 search of an Express Mail package addressed to 1804 Iroquois Street, in Knoxville, Tennessee, revealed 9.8 pounds of marijuana. [Doc. 91, Exh. 3, ¶22] The affidavit states that the Defendant texted the postal carrier to inquire about this package on December 8, 2012, stating that it was "lost in transit somehow." [Doc. 91, Exh. 3, ¶22]

[9]The affidavit relates that Lamar Johnson is known to law enforcement from prior narcotics investigations.  [Doc. 91, Exh. 3, ¶10] Johnson lives at 1613 Wilder Place Avenue, Knoxville, Tennessee.  [Doc. 91, Exh. 3, ¶11] On August 2, 2012, a postal carrier reported that a black male in his mid-twenties with dreadlocks retrieved a parcel, which a resident of 1613 Wilder Place, had declined.  [Doc. 91, Exh. 3, ¶11] The black male stated that his grandmother did not know the package was coming to their address and offered the carrier $100 "for his trouble."  [Doc. 91, Exh. 3, ¶11] During surveillance at several Knoxville addresses of the delivery of packages suspected in the investigation, officers observed Johnson at the residence or arriving after the delivery.  [Doc. 91, Exh. 3, ¶15] On November 20, 2012, officers observed Johnson sign the name "Tim Reese" for a package from Spanaway, Washington, delivered to 1733 Rosedale Street in Knoxville.  [Doc. 91, Exh. 3, ¶24]    While conducting surveillance of the delivery of two Express Mail packages on January 3, 2013, to addresses previously receiving packages in this investigation, Inspector Boles observed Johnson driving evasively and making

24

argues that neither the Custer address nor the alias Dwayne Benson are linked to him and that Lamar Johnson's evasive driving with mail in the car cannot provide probable cause to suspect that a different package contains controlled substances.

The Defendant's first argument appears to be that Inspector Boles' affidavit fails to link the suspect package to him. The Court finds this to be a nonstarter with regard to whether the affidavit provides probable cause to search the package. The issuance of a search warrant does not turn upon whether the person with an expectation of privacy in the location to be searched[10] is charged with a crime or is the target of an investigation. Instead, a search warrant may issue upon the judge finding probable cause to believe that the location to be searched contains contraband or the evidence of a crime. Besase, 521 F.2d at 1307.

> There is no constitutional requirement that the warrant name the person who owns or occupies the described premises. The specificity required by the Fourth Amendment is not as to the person against whom the evidence is to be used, but rather as to the place to be searched and the thing to be seized.

---

unnecessary turns in a manner often used by drug dealers to observe law enforcement. [Doc. 91, Exh. 3, ¶23] On January 8, 2013, Inspector Boles reviewed a video surveillance tape showing a black male with dreadlocks, whom she identified as Johnson, mailing the instant suspect package. [Doc. 91, Exh. 3, ¶24-25]

[10]The Defendant's argument raises the question of whether the Defendant has standing to challenge the search of the Express Mail package to Dewayne Benson. Arguably, the Defendant has no legitimate expectation of privacy in a package not mailed to or from him. See United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001) (holding that "a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched"). Nevertheless, the Court finds that Inspector Boles' affidavit links the Defendant to drug trafficking between Spanaway, Washington, and Knoxville, Tennessee. The affidavit also states that false recipients and/or addresses were used on the packages in the investigation. In the interest of justice, the Court will permit the Defendant to challenge the evidence seized in the three searches of packages related to this investigation.

25

Id. (citations omitted); see also Zurcher v. The Stanford Daily, 436 U.S. 547, 557 (1978). Thus, the Court will examine whether probable cause existed to issue a search warrant for the Express Mail package in question.

The Defendant also argues that Lamar Johnson's actions in driving evasively with mail in the car do not provide probable cause, because the two packages involved in the evasive driving were not confirmed to contain drugs. Accordingly, he contends that the information about evasive driving does not provide probable cause to search a subsequent Express Mail package mailed by Lamar Johnson. The affidavit states that Inspector Boles suspected two Express Mail packages, being sent from Washington to Knoxville, were linked to this investigation. [Doc. 91, Exh. 3, ¶23] The packages were addressed to 1605 Tecumseh Drive and 2458 Brooks Drive, both of which had previously received suspected drug packages. [Doc. 91, Exh. 3, ¶23] Inspector Boles observed the delivery of the Tecumseh Drive package and then saw Johnson arrive at that address and pick up the package. [Doc. 91, Exh. 3, ¶23] Officers followed Johnson and saw him make "heat runs," which is driving evasively and making unnecessary turns in order to learn whether one is being followed by police. [Doc. 91, Exh. 3, ¶23] Officers lost sight of Johnson, but other officers subsequently saw him arrive at 2458 Brooks Avenue, the address to which the other package was delivered. [Doc. 91, Exh. 3, ¶23]

The Court finds that Johnson's evasive driving when leaving with a package linked to the drug trafficking investigation provides support to a probable cause finding.[11] Moreover, this is not

_____

[11]In his supplemental brief, the Defendant argues that Inspector Boles admitted at the May 30 hearing that she had no prior knowledge of Lamar Johnson's driving habits. The Court finds that this testimony was not before the issuing judge and cannot be considered in the Court's assessment of probable cause.

the only information that the issuing judge had. The information on Lamar Johnson's actions with regard to the Tecumseh Drive and Brooks Avenue packages must be viewed along with his other actions stated in the affidavit, the characteristics of the instant Express Mail package, and the history of the investigation, including the evidence gained in prior searches. The Court finds that the totality of the circumstances stated in Inspector Boles' affidavit provides probable cause to search the instant Express Mail package.

*(ii) Facial Defect*

The Defendant also argues that the evidence seized from the search of the Express Mail package to Dewayne Benson must be suppressed because the January 9 search warrant fails to state the date by which the search warrant must be executed. The January 9 search warrant states "YOU ARE COMMANDED to execute this warrant on or before," which language is followed by a blank that was not filled. [Doc. 91, Exh. 3, p.2] Underneath the blank, the words "not to exceed 14 days" appear in parentheses. [Doc. 91, Exh. 3, p.2] The sentence concludes with two options, that the search occur in the daytime or occur anytime day or night, neither of which is checked. [Doc. 91, Exh. 3, p.2] The Defendant argues that the issuing judge's failure to provide this information makes the search warrant invalid. The Government argues that the search warrant states that it must be executed within fourteen days in compliance with Federal Rule of Criminal Procedure 41. It also contends that the Defendant suffered no prejudice from this ministerial error because the package was searched the same day that the search warrant was issued.

Rule 41 requires that a search warrant "must command the officer to . . . execute the warrant within a specified time no longer than 14 days [and] execute the warrant during the daytime, unless

27

the judge for good cause expressly authorizes execution at another time[.]" Fed. R. Crim. P. 41(e)(2)(A)(i)-(ii). "'[V]iolations of Rule 41 alone should not lead to exclusion [of evidence] unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.'" United States v. Searp, 586 F.2d 1117, 1125 (6th Cir. 1978) (quoting United States v. Burke, 517 F.2d 377, 386-87 (2d Cir.1975)), cert. denied, 440 U.S. 921 (1979); see also Frisby v. United States, 79 F.3d 29, 32 (6th Cir. 1996) (holding that "ministerial" violations of Rule 41, such as the failure to leave a copy of the warrant and a receipt for the property seized, do not require application of the exclusionary rule unless the defendant can show prejudice resulting from the violation).

In the instant case, the Court discerns no prejudice to the Defendant from the warrant's lack of a time frame for execution. The search warrant reflects that it was issued at 3:08 p.m., on January 9, 2013. Inspector Boles testified that it was executed that same day. The Court finds that the January 9 search warrant was executed well within the fourteen days required by the rule and, in fact, on the same day that it was issued. Moreover, there is no evidence that the issuing magistrate judge deliberately disregarded Rule 41's requirements regarding the timing of the execution of the search warrant. The Court finds that the failure to comply with Rule 41(e)(2)(A)(i)-(ii) does not require the exclusion of the evidence seized from the package.

*(4) Good Faith Exception*

Finally, the Government argues that if the Court finds that the search warrants are invalid

28

because their issuance was not supported by probable cause,[12] the evidence seized in the search of the packages should not be excluded because the executing officers acted in good faith reliance on the search warrants. "The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" United States v. Herring, 129 S. Ct. 695, 699 (2009) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). In the instant case, the Court has found no basis to suppress the evidence seized pursuant to the three search warrants. Thus, the Court finds no need to employ either the exclusionary rule or the good faith exception in this case.

## B. Defendant's February 11, 2013 Statement

The Defendant also seeks to suppress a statement he gave to law enforcement following his arrest on February 11, 2013. The Defendant argues that the officers violated his right to counsel

---

[12]The Government acknowledges that the good faith exception does not save a search warrant that is defective on its face. See United States v. Lazar, 604 F.3d 230, 237-38 (6th Cir. 2010).

under both the Fifth and Sixth Amendments by continuing to question him after he asked for counsel. He contends that he requested counsel and counsel arrived while Investigator Maupin and Inspector Boles were interviewing him. He asserts that based upon his request for counsel, the officers should have never interviewed him in the first place. Thus, he argues that his statement must be suppressed. The Government responds that the Defendant voluntarily gave his statement following a lawful arrest.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). The Fifth Amendment's protection against self-incrimination "includes a right to counsel during custodial interrogation." Moore v. Berghuis, 700 F.3d 882, 886 (6th Cir. 2012). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474. Once the defendant requests counsel, law enforcement may not continue to question him or her or subsequently approach the individual for questioning until the individual has counsel available. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); United States v. Soto, 953 F.2d 263, 264 (6th Cir. 1992). Questioning of the person may not resume in the absence of an attorney "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85; McKinney v. Ludwick, 649 F.3d 484, 489 (6th Cir. 2011) (holding that after the accused requests an attorney, "the government cannot demonstrate a valid waiver of this right absent the necessary fact that the accused, not the police, reopened the dialogue with the authorities").

The Sixth Amendment guarantees the assistance of counsel to criminal defendants. "This right is triggered 'at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" <u>Alexander v. Smith</u>, 311 F. App'x 875, 887 (6th Cir. 2009) (quoting <u>Fellers v. U.S.</u>, 540 U.S. 519, 523 (2004)). "Once the Sixth Amendment has attached, the government may not 'deliberately elicit' incriminating statements from the defendant without the presence of his attorney." <u>Id.</u> (quoting <u>United States v. Henry</u>, 447 U.S. 264, 270 (1980)). "[T]he Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." <u>Montejo v. Louisiana</u>, 556 U.S. 778, 786 (2009). The Sixth Amendment right to counsel may be waived even before the defendant is represented by counsel. <u>Id.</u>

Even though the <u>Miranda</u> rights arise under the Fifth Amendment protection against self-incrimination, the defendant's receipt of the advice of rights pursuant to <u>Miranda</u>–which includes the right to have an attorney present during interrogation–and the defendant's waiver of the <u>Miranda</u> rights also serves to waive the Sixth Amendment right to counsel. <u>Id.</u> "'As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.'" <u>Id.</u> at 786-87 (quoting <u>Patterson v. Illinois</u>, 487 U.S. 285, 296 (1988)). The request for or appointment of counsel does not presumptively invalidate the defendant's subsequent waiver of his Sixth Amendment right to counsel. <u>Id.</u> at 797 (overruling <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986)).

Moreover, "an arrested person's confession is inadmissible if given after an unreasonable

delay in bringing him before a judge." Corley v. United States, 556 U.S. 303, 307 (2009) (stating the McNabb-Mallory rule). Congress has provided a "safe harbor" for confessions made within six hours of a defendant's arrest:

> [A] confession made or given by a person . . . while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such a person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention.

18 U.S.C. § 3501(c); United States v. McDowell, 687 F.3d 904, 908 (7th Cir. 2012) (holding that a "confession given within six hours of arrest is admissible notwithstanding a delay in presentment if the judge finds it was voluntary").

In the instant case, the Defendant was indicted prior to his arrest and, thus, his Sixth Amendment right to counsel had attached at the time he gave his statement. Nevertheless, the Court finds that the Defendant's statement was voluntary, given at his own request, and made well within the six-hour safe harbor. First, the Court finds that the Defendant was twice advised of his Miranda rights, including his right to counsel, prior to making his statement. The record is devoid of any evidence of police coercion. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) (observing that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988) (holding that "[i]f the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed"). The officers did not yell at the Defendant or otherwise attempt to intimidate him, the

questioning was not lengthy, and the Defendant had prior exposure to the criminal justice system. Moreover, the Court finds that the Defendant did not request counsel at any time before making a statement. Additionally, the Defendant himself asked to "talk" with Investigator Maupin. The Court finds no evidence that Investigator Maupin and Inspector Boles deliberately elicited a statement from the Defendant. Finally, the Court finds that the Defendant's statement was made shortly after his arrest and was not the product of a delay in bringing the Defendant before a magistrate judge. The Court finds no basis to suppress the Defendant's February 11, 2013 statement.

## V. CONCLUSION

After carefully considering the motion, memoranda, oral arguments, exhibits, and relevant legal authorities, the Court finds no basis to suppress the evidence gained in the searches of the three Express Mail packages or to suppress the Defendant's February 11, 2013 statement. For the reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress Statement [**Doc. 70**] and his Motion to Suppress Evidence [**Doc. 72**] be **DENIED**.[13]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[13]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).